1510440

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No. 8:15-CV-02672-SDM-TBM**

JAIME FAITH EDMONDSON; ALANA CAMPOS;
JOHN COULTER; JESSICA BURCIAGA; BRENDA
LYNN GEIGER; CLARK GILMER. JESSICA HINTON;
RACHEL BERNSTEIN KOREN; AMBER LANCASTER;
URSULA MAYES; CARRIE MINTER; DESSIE
MITCHESON; SABELLA SHAKE; TIFFANY TOTH;
IRINA VORONINA, LAURIE ANN YOUNG, CARMEN
ELECTRA and CARISSA ROSARIO,

  Plaintiffs,

v.

CALIENTE RESORTS, LLC D/B/A CALIENTE RESORT
and CALIENTE VACATION CLUB, LLC,

  Defendants.

_____/

**DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE OPINION**
**AND TESTIMONY OF PLAINTIFFS' EXPERT DAMAGES WITNESS**
**STEPHEN CHAMBERLIN**

Defendants, CALIENTE RESORTS, LLC D/B/A CALIENTE RESORT ("Caliente Resort" and CALIENTE VACATION CLUB, LLC (the "Vacation Club") (collectively, "Caliente" or "Defendants"), by and through their undersigned counsel, hereby file this Motion to Exclude the Opinion and Testimony of Plaintiffs' Expert Damages Witness Stephen Chamberlin, and in support state:

1.    This is an action for damages and injunctive relief sought by Plaintiff Models JAIME FAITH EDMONDSON, ALANA CAMPOS, JOHN COULTER, JESSICA BURCIAGA, BRENDA LYNN GEIGER, CLARK GILMER, JESSICA HINTON, RACHEL BERNSTEIN KOREN, AMBER LANCASTER, URSULA MAYES, CARRIE MINTER,

1

DESSIE MITCHESON, SABELLA SHAKE, TIFFANY TOTH, IRINA VORONINA, LAURIE ANN YOUNG, CARMEN ELECTRA and CARISSA ROSARIO ("Plaintiffs" or "Models").

2.      The Plaintiffs' claims center around their allegations that the Defendants have pirated and altered the images, likeness and/or identity of each Plaintiff Model for advertising and commercial purposes.  Plaintiffs further claim that any use of their image or likeness was without consent and that any use has jeopardized each Plaintiff's image, brand and marketability causing damages.  (Doc. 80).

3.      The Plaintiff Model's images were used in one or more of sixteen (16) different flyers/advertisements, ninety percent (90%) of which were solely created by Peter Smith to advertise events held at Caliente that were hosted, sponsored, and staffed by AAHz.  (Smith at pp. 28-33, 79, 85-86, 89, 91, 105).  (In this motion, the symbol "(Deponent's Last Name at ##)" will be used to refer to the named deponent's deposition in this matter which has been simultaneously filed herewith.)

4.      The undisputed record evidence will also show that both the Defendants and Peter Smith had a legitimate belief that they possessed rights to publish the images on the flyers. (Dorsey Vol 1 at pp. 67, Dorsey Vol 2 at pp. 162-164, and 166; Denning Vol 1 at p. 118; Smith at 14-16, 23, 25-26, 79, 85-86, 89, 91, 105).

5.      The Plaintiffs proffered the expert opinion of Stephen Chamberlin (Chamberlin) to provide testimony in support of Plaintiffs' damages claims.

6.      As explained in more detail below, Chamberlin's testimony regarding the Plaintiffs' alleged damages should be excluded by this Court because it fails to satisfy *Daubert's* requisite elements:  competency; reliable methodology; and helpfulness.

7.      Chamberlin is not competent to render an opinion on hypothetical license fees for images used in the advertisements of night clubs and other adult entertainment clubs and resorts. Moreover, Chamberlin's opinion is unreliable in both its methodology and application.  It is also irrelevant and it will not assist the trier of fact.

8.      In his report and testimony, Chamberlin proffered an opinion as to the amount of the individual Plaintiff Models' damages.  Chamberlin's opinion purportedly relies on the concept of a "hypothetical license" for the use of the image(s) between each individual Plaintiff Model and the Defendants.

9.      Specifically, Chamberlin employs two different methodologies to arrive at a damage range with a low value and a high value.  Chamberlin states that the low value is a "Fair Market Value" ("FMV"); whereas, the high value is a three-time multiplier ("3X Multiplier") which includes damage to professional standing and publicity.

10.     Chamberlin calculates the FMV by assigning a baseline value ("Value") for each Plaintiff Model's image.  Chamberlin then multiplies that Value by the number of images and the number of usages ("Usage Multiplier") to arrive at the FMV.

11.     To obtain the 3X Multiplier, Chamberlin simply multiplies the FMV by a factor of three.

12.     As will be discussed below, Chamberlin's expert damage opinions are not based on any reliable methodologies.  Chamberlin's FMV and 3X Multiplier calculations have neither been tested nor validated.  These calculations also ignore and fail to apply relevant evidence as well as evidence of comparable transactions.

13.     And the underlying factors upon which the methodologies are based cannot be analyzed or challenged because Chamberlin failed to identify any objective data. Indeed,

Chamberlin failed to provide any support for his calculations.  He did not provide any information with regard to any Model's actual earnings history.  Neither did he provide any information relating to the Model's contractual rates at the time the images were used.

14.     Chamberlin's FMV and 3X Multiplier calculations constitute nothing "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. They should be excluded as unreliable.

15.     Chamberlin also seeks to provide opinion testimony relating to the potential impact of the Plaintiff Models' images being used on advertising for Caliente Resorts. Chamberlin is not competent to provide this testimony and it additionally lacks reliability.

16.     Based on the foregoing it is clear that Chamberlin's opinions are unsupported by any facts or data and are nothing more than a hunch.  Accordingly, Chamberlin's expert damages opinion must be excluded as unreliable.

**MEMORANDUM OF LAW**

**I.     EXPERT TESTIMONY IS ONLY ADMISSIBLE IF SATISFIES THE STRINGENT REQUIREMENTS OF FEDERAL RULE OF EVIDENCE 702.**

**A.      Requirements for Admissibility**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702 (2016).  When evaluating evidence proffered under Rule 702, the district court acts as a gatekeeper to ensure that all expert testimony is relevant and reliable.  *Kumho Tire Co. v. Carmichael*, 5226 U.S. 137, 147-148 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *United States v. Frazier*, 87 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

The United States Supreme Court has explained that Federal Rule of Civil Procedure 702 compels trial courts to perform the critical "gatekeeping" function regarding the admissibility of expert opinion testimony.  "Daubert requires that trial courts act as 'gatekeepers' to ensure that **speculative, unreliable expert testimony** does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (internal quotation omitted) (emphasis added).  The importance of this function cannot be overstated, as the Supreme Court explained in *Kumho Tire*: "The objective of that requirement is to **ensure the reliability and relevancy of expert testimony**. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152 (emphasis added).

In all cases, the trial court must find that an expert witness's proffered testimony "is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed.R.Evid. 702 advisory committee's note (2000 amends.)  The trial court's gatekeeping function **requires more than simply 'taking the expert's word for it**.' *Frazier*, 387 F.3d at 1262 (citing Fed.R.Evid. 702 advisory committee's note (2000 amends.)).  "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

A court must **focus on methodology**, not conclusions.  Under *Daubert v. Merrell Dow Pharmaceuticals*, 590 U.S. 579, 590 (1993), the subject of an expert's testimony must be

"scientific knowledge."  As the *Daubert* Court explained: "The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.*  "The touchstone of the scientific method is empirical testing—developing hypotheses and testing them through blind experiments to see if they can be verified." *Perez v. Bell S. Telecommunications, Inc.*, 138 So. 3d 492, 498 (Fla. 3d DCA 2014) (citing Daubert, 590 U.S. at 593) (additional citation and footnote omitted).

"Daubert requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick*, 61 F.3d at 1335 (internal quotation omitted).  The United States Supreme Court has explained that Federal Rule of Civil Procedure 702, compels trial courts to perform the critical "gatekeeping" function regarding the admissibility of expert opinion testimony.  The importance of this function cannot be overstated, as the Supreme Court explained in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999): "The objective of that requirement is to **ensure the reliability and relevancy of expert testimony**. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152 (emphasis added).

In keeping with their critical gatekeeping function, the trial courts must consider whether:

(1)    the expert is qualified to **testify competently** regarding the matters he intends to address;

(2)    the methodology by which the expert reaches his conclusions is **sufficiently reliable** as determined by the sort of inquiry mandated in *Daubert*; and

(3)    the testimony **assists the trier of fact**, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Kilpatrick*, 613 F.3d at 1335; *Frazier*, 387 F.3d at 1260. *See also Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1328 (11th Cir. 2014).  As the court explained in *Frazier*, the party offering the expert testimony bears a substantial burden of establishing each of these required elements, and failure to do so is fatal to the admissibility of the expert's testimony.  *Id.* The trial court has discretion in determining whether to receive or exclude evidence.  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.,* 402 F.3d 1092 (11th Cir. 2005) (appellate court reviews a trial court's ruling admitting or excluding expert testimony for abuse of discretion and it will not reverse unless the ruling is manifestly erroneous, even if the ruling may be outcome-determinative) (citations omitted).

With respect to the testimony of their damages expert Chamberlin, the Plaintiffs have failed to meet the burden as to all three *Daubert* elements:  competency; reliable methodology; and helpfulness.

### B.      Stephen Chamberlin is Not Qualified to Testify Competently

A witness is not qualified to testify on issues outside of his area of expertise. *Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999).  Chamberlin seeks to provide testimony relating to the calculation and valuation of a hypothetical license fee for Caliente's use of the Plaintiff Model's images in the flyer/advertisements.  Chamberlin also seeks to apply a 3-factor multiplier to account for alleged, potential reputation damages.  Chamberlin is not qualified to testify competently on these matters.  While Chamberlin testified that he was familiar with the concept of a hypothetical license presuming a willing buyer and seller, he does not have experience in formulating a hypothetical license.  Moreover, in calculating a hypothetical license fee in this case, Chamberlin presumed an unwilling buyer, an unwilling seller, and an inability to negotiate the contract rate.  Chamberlin also lacks any experience in negotiating or pricing model contracts in the night club and adult entertainment history. Neither does he have a background in

advertising or marketing.  Chamberlin's testimony must be excluded in this case due to a lack of competency. Quite simply, he lacks the requisite education, experience and knowledge to calculate a hypothetical license fee and to otherwise testify regarding alleged, potential reputational damages and the concepts of branding and endorsement.

## C.    Chamberlin's Opinion and Testimony is Not Reliable

### 1.    *Relevant Factors and Consideration in Assessing the Reliability of an Expert's Methodology and the Application of that Methodology.*

In assessing reliability under the second *Daubert* prong, courts should consider the following non-exhaustive factors:  "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (citations omitted).  The court's gatekeeping inquiry, however, must be tied to the facts of the case before it.  *Kumho*, 526 U.S. at 150 (citing *Daubert*, 509 U.S. at 591).  As such, when an expert's proffered testimony is primarily based on experience, as is Chamberlin's testimony in this case, relevant reliability concerns may also focus on personal knowledge and experience.  *Id.* For example, in evaluating the testimony of an experienced-based expert, the trial court may inquire as to how often the expert's experience-based methodology has produced erroneous results; whether such experienced-based methodology is generally accepted in the expert's relevant community; and whether the expert's preparation is one that others in the expert's field would recognize as acceptable.  *Id.*

In all cases, the trial court must find that an expert witness's proffered testimony "is properly grounded, well-reasoned, and not speculative before it can be admitted."  Fed.R.Evid. 702 advisory committee's note (2000 amends.)  The trial court's gatekeeping function requires

more than simply 'taking the expert's word for it.' *Frazier*, 387 F.3d at 1262, citing Fed.R.Evid. 702 advisory committee's note (2000 amends.).  "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.  Expert witness testimony should be excluded when it is based on the expert's own *ispe dixit* and there is "simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. *See also Witt v. Stryker Corp. of Michigan*, 648 Fed. Appx. 867, 873 (11th Cir. 2016).

In conducting its analysis, the court as a gatekeeper must ensure not only that the expert's methodology is reliable, but also that that the expert reliably applied his methodology. *Kumho*, 526 U.S. at 154.  That is, whether the expert reliably analyzed the underlying data and whether the expert reliably drew conclusions from this analysis and from the underlying data. *Id.* Additionally, when the expert is proffered to provide non-scientific, experience-based testimony, "the Court must satisfy itself that the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653 (S.D. Fla. 2012).

**2.     *Determination of Actual Damages Based on a "Hypothetical License"***

In intellectual property cases, the determination of actual damages may be based on the value of a "hypothetical license."  *See e.g. Beastie Boys v. Monster Energy Co.*, 983 F.Supp2d 369 (S.D. New York 2014) (Lanham Act); *Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*, CIV. 09-1426 JRT/SER, 2011 WL 4537970, at *4 (D. Minn. 2011) (Lanham Act).  In patent cases, this concept is referred to as a "reasonably royalty." *Id.* While a hypothetical negotiation "necessarily involves an element of approximation and uncertainty," it also "requires a court to hypothesize, not to speculate." *See, respectively, Lucent Technologies, Inc. v. Gateway, Inc.*,

580 F.3d 1301, 1325 (Fed. Cir. 2009) and *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  This is so because a "damages theory must be based on sound economic and factual predicates."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (internal quotation and citation omitted).

The amount of the hypothetical license is the amount that a willing buyer would have been reasonably required to pay a willing seller. *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir. 2014); *Real View, LLC v. 20-20 Techs, Inc.*, 811 F.Supp.2d 553, 556 (D. Mass 2011).  The touchstone of the hypothetical license fee is reasonable market value and the fee is only appropriate if it is not based on undue speculation. *Oracle*, 765 F.3d at 1088; *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004).  "Thus, [the court does] not ask what the owner **would like to have charged if unconstrained by reality**, but what a willing owner actually would have charged after negotiation with the buyer.  That is, fair market value is based on '**an objective, not a subjective analysis**.'" *Oracle*, 765 F.3d at 1088 (internal quotation and citation omitted) (emphasis added). *See also Rivera v. Mendez & Companier*, 988 F.Supp.2d 174, 179-180 (D. P.R. 2013) ("The hypothetical does not focus on the subjective willingness or valuations of the parties, but rather the objective fair market value of the use.") (citing *Davis v. The Gap, Inc*. 246 F.3d 152, 166 (2d Cir. 2001)).

Hypothetical license fees that lack a foundation in **objective** evidence do not satisfy the requirements of Rule 702 and they must be excluded from evidence.  *See Star Disc. Pharmacy, Inc. v. MedImpact Healthcare Sys., Inc.,* 5:11-CV-02206-AKK, 2014 WL 4470720 (N.D. Ala. 2014) *aff'd,* 614 Fed. Appx. 988 (11th Cir. 2015); *Rivera*, 988 F.Supp.2d at 179-180. An expert's report must contain citations to the **actual facts or data** relied on in his opinion.  *Star Disc. Pharmacy*, 2014 WL 4470720 at *8 (emphasis supplied).  Absent this underlying data, an

expert's opinion constitutes nothing more than inadmissible theoretical speculations, unsupported assumptions and conclusory allegations. *Id.* This is so because "theoretical speculations, unsupported assumptions, and conclusory allegations **without supporting facts** have no probative value." *Id.* "[C]ertainly where an expert's testimony amount to no more than a mere guess or speculation, a court should exclude his testimony." *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988).

Additionally, in the context of a hypothetical license, the expert must consider objective evidence of actual historical rates as well as the rates for comparable transactions. *Id.* *See also Rivera*, 988 F.Supp.2d at 179-180. Licenses that "ar[i]se from divergent circumstances" and "covered different materials" are insufficient to support a damage award. *Enpat, Inc. v. Budnic*, 773 F. Supp. 2d 1311, 1315 (M.D. Fla. 2011) (citing *Lucent*, 503 F.3d at 1329). Any comparable transactions, must be sufficiently comparable to the hypothetical license at issue in the lawsuit; a hypothetical license fee cannot rely on other transactions that are "radically different." *Hollister Inc. v. Zassi Holdings, Inc.*, 3:13-CV-132-J-32PDB, 2016 WL 1238025, at *12 (M.D. Fla. 2016) (*on appeal* 17-10135).

**3.**     ***Chamberlin's Expert Opinion on Damages Must Be Excluded as Unreliable.***

**a.**     **Introduction and Overview of Chamberlin's Expert Damages Opinion**

In his report and testimony, Chamberlin proffered an opinion as to the amount of the individual Plaintiff Models' damages. Chamberlin's opinion purportedly relies on the concept of a "hypothetical license" for the use of the image(s) between each individual Plaintiff Model and the Defendants. Specifically, Chamberlin employs two different methodologies to arrive at a damage range with a low value and a high value. Chamberlin states that the low value is a "Fair Market Value" ("FMV"); whereas, the high value is a three-time multiplier ("3X Multiplier") which includes damage to professional standing and publicity. Chamberlin calculates the FMV

by assigning a baseline value ("Value") for each Plaintiff Model's image.  Chamberlin then multiplies that Value by the number of images and the number of usages ("Usage Multiplier") to arrive at the FMV.  To obtain the 3X Multiplier, Chamberlin simply multiplies the FMV by a factor of three.  Finally, Chamberlin provides opinion testimony relating to the potential impact of the Plaintiff Models' images being used on advertising for Caliente Resorts ("Endorsement, Branding, and Reputation Testimony").

As will be discussed below, Chamberlin's expert damage opinions on to the low value of damages, FMV and the high value of damages, 3X Multiplier, as well as his Endorsement, Branding and Reputation Testimony are not based on any reliable methodologies.  Chamberlin's FMV and 3X Multiplier calculations have neither been tested nor validated.  These calculations also ignore and fail to apply relevant evidence.  And the underlying factors upon which the methodologies are based cannot be analyzed or challenged because Chamberlin failed to identify any objective data. Chamberlin's FMV and 3X Multiplier calculations constitute nothing "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. They should be excluded as unreliable.

Chamberlin's Endorsement, Branding, and Reputation Testimony similarly lacks reliability.  Chamberlin is unable to explain "how his **experience** leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653 (S.D. Fla. 2012).  As such, Chamberlin's Endorsement, Branding and Reputation Testimony must also be excluded as being unreliable.

### b.      Chamberlin's Determination of the Value of each Image is Unreliable

As explained above, Chamberlin calculates the FMV by assigning a baseline value "Value" for each Plaintiff Model's image.  Chamberlin then multiplies that Value by the number

of images and the number of usages ("Usage Multiplier") to arrive at the FMV.  Chamberlin's

FMV calculation is purportedly based on the concept of a hypothetical license, which is that

agreement made between a "willing buyer" and a "willing seller."  *See Oracle*, 765 F.3d at 1088.

In distortion of the willing buyer/willing seller construct, however, Chamberlin's FMV

calculation presumes that there was **no willing buyer** because the Defendants had "already taken

the images and used them."  (Chamberlin at 186).  He also related that "It doesn't happen that

often that people steal images like that and use it.  It's not something that you negotiate in image

use."  (Chamberlin at 206).  Chamberlin's calculation also improperly presumes a **"full sticker

price"** valuation because there was **"no one to negotiate"** the rate.  (Chamberlin at 110-111,

151-152, 157, 189).  Chamberlin explained that because there was no one to negotiate with he

"had to work backwards" from an image. (Chamberlin at 151-152, 157, 186).  He opined:

"There's no other way of calculating it."  (Chamberlin at 110-111).  Chamberlin's "full sticker

price" valuation methodology falls far short of the requisite willing buyer/willing seller construct

upon which hypothetical licenses are reliably calculated.  *Oracle*, 765 F.3d at 1088; *Rivera*, 988

F.Supp.2d 174.   Unconstrained by reality, Chamberlin's "full sticker price" valuation must be

excluded as unreliable.  *Id.*

Chamberlin's Value determination is additionally unreliable because it is based on an

unsupported hypothesis that is also contrary to the willing buyer/willing seller construct. In

determining the Value of each Plaintiff Models' image, Chamberlin explained: "I had to come up

with a rate that I believe is entirely justifiable in what they demand for the work for a client that

they wouldn't work for or a product that they wouldn't endorse."  (Chamberlin at 186 (quoted

material); also, at 119-120, 169, 170, 202, 224).  Chamberlin further explained that that there

was "no agent in the world" who would ever book a model for a "swinger's lifestyle resort."

(Chamberlin at 170, 202).  Chamberlin's presumptions that the Plaintiff Models' wouldn't work for or endorse Caliente Resorts and that no agent would ever book such a job further evidence the fact that his methodology ignores the construct of a willing buyer/willing seller negotiation. Such a valuation is inherently unreliable as it focuses on subjective willingness and valuations of the individual parties.  *See Rivera*, 988 F.Supp.2d at 179-180.

The Value determination is additionally unreliable because it is not based on any objective data or facts.  Chamberlin testified that in determining the amount to assign to the Value for each Plaintiff Models' image, he took into account the individual Model's payment history, work quality, experience, exposure and duration of career.  He then stated this this Value was "equal to or more of the highest day rate the Model's had ever earned."  (Chamberlin at 190).  Chamberlin emphasized that the nature of the client and the product was a primary factor in determining the Value for each image and that there is a premium for embarrassment products. (Chamberlin at 174). He further explained that is why that Value had to be equal or greater to the Model's highest day rate because of the nature of the client and the product.  (Chamberlin at 105, 107, 190, 208, 221).  Chamberlin then repeatedly emphasized that the type of product was a primary factor in determining this Value. (*Id.*).

Importantly, however, while Chamberlin stated that he based each Value on the individual Plaintiff Model's highest day rate, he did not include any information in his report regarding the actual amount of each model's highest day rate.  Neither could he identify any specific contract associated with each model's highest day rate.  (Chamberlin at 201).  While he repeatedly proffered that this information is in his supporting documentation, he failed to actually cite a single fact or other document in either his report or testimony even when pressed at deposition to do so.  (Chamberlin at 120, 124-125, 130).

Chamberlin testified that his determination of the Value to be assigned was also based on his on-line research, included reviewing articles and gathering of photographs of the Plaintiff Models through Google searches as well as his viewing of their YouTube videos.  (Chamberlin at 145-146).  He explained that he researched as much as he could to understand each of the individual Plaintiff Model's day rate and their historical earnings.  (Chamberlin at 104, 131).  Chamberlin explained that he utilized all of this information along with his years of experience in the modeling industry to come up with the Value for each image.  (Chamberlin at 146-147, 148).  But, Chamberlin did not keep any record of when, how and where this research was performed.   (Chamberlin at 133).  Neither did he keep any record of the results.  (Chamberlin at 146-147, 148).  Chamberlin could not even identify the origin of the photographs or how long ago they were taken.  (Chamberlin at 99).  Chamberlin acknowledged that he did not list this information individually; he explained, however, that it was all considered. (Chamberlin at 146-147, 148).

Chamberlin related that he also spoke to the individual Plaintiff Models as well as their agents regarding their modeling history, including their earnings and type of clients. (Chamberlin at 102).  Chamberlin did not take any notes or otherwise document any of these conversations either.  (Chamberlin at 115, 117-118, 133-134, 144, 149-150).  Chamberlin was unable to provide any testimony regarding the Plaintiff Models' earning capabilities or highest day-rate.   (Chamberlin at 118, 119).   This information was not included in his report. (Chamberlin at 106).  Neither did he compile a list of the jobs the models have completed over the last few years.  (Chamberlin at 121, 143-144).  Chamberlin also denied knowing how much each Plaintiff Model generated in income in 2014 or 2015.  (Chamberlin at 116).  Chamberlin attempted to explain though that while none of this above information was written down it was

reflected in the Value he assigned along with other factors.  (Chamberlin at 128).  He also defensively opined that all of this information could be found in the supporting documents. (Chamberlin at 118-119, 121-122, 127, 129, 135-136, 190, 198-199).

Lacking any objective evidence, it is impossible to analyze or challenge the underlying factors upon which Chamberlin based his Value. Chamberlin's lack of citation to the actual fact and/or data relied on in his opinion renders his methodology unreliable due to a lack of foundation in objective evidence. *Star Disc. Pharmacy*, 2014 WL 4470720 at *8.  Indeed, absent any specific supporting facts, Chamberlin's opinion can neither be duplicated nor tested.  Such opinions lack any probative value and constitute nothing more than unsupported assumptions and speculation.

Chamberlin's valuations were not based on any comparable transactions either.  For example, the Value for Plaintiff Mitcheson's image(s) was set at $30,000, based on her previous dissimilar contract for a toothpaste television commercial.   (Chamberlin at 125, 126). Chamberlin did not recall any specific information on how Mitcheson's $30,000 fee was broken down, if it was a single buyout or included residuals, or the length of the contract.  (Chamberlin at 126).  Similarly, several other Plaintiffs received contracts for being Playmate of the Month ($25,000) or Playmate of the Year ($100,000) with Playboy. Yet, these Playboy contracts were also dissimilar as they encompassed a month or year of appearances and multiple shoots at different locations.

Chamberlin's calculations and valuations also ignored and failed to apply other relevant evidence.  Most importantly, Chamberlin admittedly did not consider the original rates, usage rights or contracts in which the Plaintiff Models were originally paid for the images which were later used by the Defendants.  (Chamberlin at 153-155, 204-205, 206).  Chamberlin explained

that since the image was being used for a different product, it changed the whole meaning of the image, and the negotiation had to start from that new starting point.  (Chamberlin at 204-205).

Additionally, Chamberlin's valuation was based on a gross day-rate; it did not include any deduction for agency fees or other expenses.   This is so even though Chamberlin acknowledged that such deductions are ordinarily made.  Chamberlin did not consider the age of the Plaintiff Model's age, either at the time the image was taken or at the time it was published. (Chamberlin at 63).  Chamberlin acknowledged that a model's career may change with age, but stated that the industry was very broad.  (Chamberlin at 63).  However, he also admitted that he did have some hesitation that the Plaintiff Model's career may have changed because they had children, etc.  (Chamberlin at 63).

Chamberlin also indicated that he considered the distribution of the images to be "world-wide" because they were published on the Defendants' web-site and Facebook pages.   But, Chamberlin did not do any research to find out how many people had access to, much less viewed the images.  (Chamberlin at 137-138).  Chamberlin explained that he didn't consider the audience size or market reach because "it once a girl – it was more about the girl being associated – the model being associated with that image – with that product."  (Chamberlin at 140). Chamberlin also considered the license to be perpetual in time, even though the maximum amount of time the images were accessible was two years, from 2014-2015.  (Chamberlin at 143).  Further, Chamberlin did not try to obtain any day-rates or pricing for images for gentlemen's clubs (strip clubs), swing clubs, or other sexual or nude modeling shoots. (Chamberlin at 169).

The foregoing clearly shows that Chamberlin's opinion fails to consider actual historical rates for comparable transactions.  Instead, it is dependent upon rates that arise from divergent

circumstances that covered different materials.   Such hypothetical license determinations constitute nothing more than wholly unsupported and conclusory assumptions.   Indeed, the speculative nature of Chamberlin's opinions became eminently clear during the depositions of individual Plaintiffs who disclosed that they have **never earned** a fee as high as that established as a Fee by Chamberlin.   Chamberlin's speculative opinions should be excluded under Federal Rule of Evidence 702 as unreliable.   *See e.g. Oracle*, 765 F.3d at 1088-1089.

### c.      Chamberlin's Usage Multiplier is Unreliable

Chamberlin's utilization of a Usage Multiplier in calculating the total FMV of the images must also fail for a lack of reliability.   Chamberlin applied a Usage Multiplier to the Value of each image based on the number of "usages" within each advertisement. A "usage" was defined as the image being used for advertising, on social media, for branding (i.e. it used a hashtag), or coupon (i.e. provided a discount on products or entry).   (Chamberlin at 30, 54-57, 156).   Chamberlin applied this Usage Multiplier despite his admission that, in a "normal negotiation," we don't multiply the usages out.  (Chamberlin at 159).   He related though that sometimes the use of an image in different mediums is separately negotiated.

For example, when an image may be used on a billboard, a social media post, a website, a magazine insert, a hang-tag, and/or on a poster, the contract may be broken down to a fixed amount for each medium.   (Chamberlin at 156, 159, 163-164, 224).   Notably absent from Chamberlin's testimony though was any support for his "usage" designations, at least which were not based on different medium, but rather on whether the same image in the same medium also used words associated with "branding" or "coupons."   Moreover, Chamberlin further admitted that he doesn't recall seeing any documentation where such a formula was employed and "it's not multiplied out often."   (Chamberlin at 156).   He explained:  "It wouldn't be a formula as such."  (Chamberlin at 158).   When asked if he could recall any negotiations broken

down that way, Chamberlin responded it's not that simple, everything is laid out, "I can't say for certain I haven't done that, but usually every – every usage is negotiated and discussed before the photos are taken." (Chamberlin at 160).  In addition to not even being supported by his own testimony, Chamberlin admitted that he did not consult with any other expert agents regarding the propriety of its application.  (Chamberlin at 167).

Chamberlin's multiplication of the Value by the number of usages improperly assumed, without any support, that separate licenses would have been issued for each individual usage of the image, rather than the issuance of a single license for all uses of the image. It also improperly fails to distinguish between the types of different usages, i.e. social media, advertising, coupon etc.  The application of the Usage Multiplier is also wholly unsupported by anyone within the modeling industry.  Even Chamberlin himself admitted that different usages aren't ever really multiplied out as a formula.  The application of the Usage Multiplier is wholly unreliable and Chamberlin's testimony regarding it must be excluded.  Hypothetical licenses cannot be based on transactions that are "radically different" from reality.  *Hollister*, 2016 WL 1238025, at *12.

### d.      Chamberlin's 3X Multiplier is Similarly Unreliable

Chamberlin proffered that a high value of damages could be obtained by multiplying the FMV of each image by a factor of 3.   Chamberlin explained that this 3X multiplier includes an assessment for damage to the Plaintiff Model's professional standing and reputation for her image being used to advertise Caliente.   (Chamberlin at 58-59, 212-214, 227). Chamberlin, however, failed to offer any support for the use of any multiplier, much less for the use of a 3-factor multiplier. When asked what was his basis for the 3X Multiplier, Chamberlin said he read it in a paper or report about the right of publicity.  (Chamberlin at 175-177).  But he didn't save a copy of the paper or report.  (Chamberlin at 175-177).  Neither could he remember where or

when he read it; nor could he recall whether it was an authoritative source.  (Chamberlin at 175-177, 213).

Additionally, and importantly, Chamberlin did not have any actual evidence that any of the Plaintiff Models lost any jobs and/or had an overall decrease in the number of jobs they were offered.  (Chamberlin 215-219).  He stated, however, that if it came out that a Plaintiff Model actually endorsed Caliente Resort it could be the end of her career.  (Chamberlin at 214, 218).  But, Chamberlin didn't even know if anyone in the industry had actually seen the advertisements.  (Chamberlin at 216-217). Of course, Chamberlin tempered this admission with his opinion that the industry thrives on gossip and rumors.  (Chamberlin at 216-217).  He also acknowledged that he didn't think the advertisements were still on-line, but he opined that, while he wasn't aware of it happening to date, maybe one of the Plaintiff Model's followers would find the images (Chamberlin at 219).

Chamberlin's 3X Multiplier is entirely based on speculation and conjecture and is nothing more than a back-end attempt at imposing punitive damages without labeling as such.  There is absolutely no bases whatsoever for the application of any multiplier, much less a 3-factor multiplier in order to assess the value of possible reputational damage.  Chamberlin's testimony on the 3X Multiplier should be excluded as unreliable. *See Hollister*, 2016 WL 1238025, at *12; *Star Disc. Pharmacy*, 2014 WL 4470720 at *8; *Oracle*, 765 F.3d at 1088-1089.

### e.  Chamberlin's Endorsement, Branding, and Reputation Testimony is Also Unreliable

Finally, throughout his report and testimony, Chamberlin opines that the appearance of a model in an advertisement means that the model endorses the product and the company within the advertisement.  Chamberlin also opines as to the alleged potential damaging effects to a model's reputation in having her image used on an advertisement for Caliente Resorts.

Chamberlin also stated that he felt his opinions as to any reputational damage were reinforced by the opinions reached by Plaintiffs' Survey Expert Martin M. Buncher. This testimony must also be excluded as unreliable.  Chamberlin has not proffered any evidence indicating that he is an expert in advertising, marketing, and/or loss of reputation.  Neither, for that matter, is he an expert on surveys.

**D.** **Chamberlin's Testimony Will Not Assist the Trier of Fact**

*Daubert's* helpfulness element turns on whether the expert's testimony "concerns matters . . . beyond the understanding of the average lay person." *Frazier,* 387 F.3d at 1262.  *See also Edwards v. Shanley*, 580 Fed.Apx. 816, 823 (11th Cir. 2014).  Helpfulness is primarily a question of relevance and it requires a valid connection to the pertinent inquiry as a condition of admissibility.  *See Daubert*, 509 U.S. at 595.  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *F.T.C. v. Washington Data Res.*, 8:09-CV-2309-T-23TBM, 2011 WL 2669661, at *1 (M.D. Fla. 2011) (*citing Frazier*, 387 F.3d at 1262–63).  In this case, Chamberlin's testimony is incomplete, unreliable and without support.  Such testimony is not helpful to the jury and it should be excluded.  *Id.*  In this case, to the extent it is based on objective evidence, Chamberlin's testimony, at best, is nothing more than what the lawyers can argue in closing. Further, any purported objection information which Chamberlin could testify to is likely identical in form and in substance to what the Model Plaintiffs' would themselves testify.  Stated simply, an expert is not needed to repeat testimony or argument to a jury.  Moreover, any such testimony would constitute improper bolstering.

## II.   IT MUST ALSO BE RELEVANT AND ITS PROBATIVE VALUE MAY NOT BE OUTWEIGHED BY UNFAIR PREJUDICE.

Even if testimony otherwise satisfies Rule 702's requirements for admissibility, the testimony must still be relevant and its probative value must not be substantially outweighed by unfair prejudice. *Daubert*, 509 U.S. at 595. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over law witnesses." *Daubert*, 509 U.S. at 595 (internal quotation omitted). As explained in *Frazier*, "[E]xpert opinion may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weight the value of such evidence against its potential to mislead or to confuse." *Frazier*, 387 F.3d at 1263. Chamberlin's testimony will only serve to confuse the jury resulting in unfair prejudice. Again, the only objective and reliable evidence that Chamberlin could testify to would parrot the Model Plaintiffs' own testimony or the argument of their counsel. The potential danger of a jury lending credence to Mr. Chamberlin's testimony simply because he is "titled an expert far outweighs any potential minimal benefits.

## III.   CONCLUSION

Chamberlin is not competent to render an opinion on hypothetical license fees for images used in the advertisements of night clubs and other adult entertainment clubs and resorts. Moreover, Chamberlin's opinion is unreliable in both its methodology and application. It is also irrelevant and it will not assist the trier of fact. In its gatekeeping role, this Court should exclude Chamberlin's testimony. *See U.S. v. Merrill*, 2010 WL 3981158 at *5 (S.D. Fla. 2010) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309) (11th Cir. 1999) ("The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in

22

factual determinations, its potential to create confusion, and its lack of probative value."). Indeed, Chamberlin's opinion and testimony on the Plaintiff Models' damages falls within those proscribed by the Seventh Circuit Court of Appeal: "For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) (citation omitted).

WHEREFORE, the Defendants, CALIENTE RESORTS, LLC D/B/A CALIENTE RESORT and CALIENTE VACATION CLUB, LLC, hereby move this Court to grant this motion and exclude the expert opinion testimony of Plaintiff's expert witness Stephen Chamberlin, and any other relief it deems just and proper.

DATED:  February 10, 2017

Respectfully submitted,

  /s/ Nicole F. Soto
Nicole F. Soto, Esq.
Florida Bar No.:  29845
nsoto@conroysimberg.com
Shannon P. McKenna
Florida Bar No.:  385158
smckenna@conroysimberg.com
Attorneys for Caliente Resorts and Caliente
Vacation Club

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>February 10, 2017</u>, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  I further certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

  /s/ Nicole F. Soto
Nicole F. Soto
Florida Bar No.:  29845
nsoto@conroysimberg.com
Shannon P. McKenna
Florida Bar No.:  385158
smckenna@conroysimberg.com
Conroy Simberg
201 East Kennedy Blvd., Suite 900
Tampa, FL 33602
(813) 273-6464
(813) 273-6465
Attorney for Caliente Resorts and Caliente Vacation
Club

**SERVICE LIST**

EDMONDSON, JAIME FAITH ET AL V. CALIENTE RESORTS, LLC d/b/a CALIENTE
RESORT ET A
Case No. 8:15-cv-02672-SDM-TBM
United States District Court, Middle District of Florida

Richard H. Martin, Esq.
richard.martin@akerman.com
Akerman LLP
401 East Jackson Street
Suite 1700
Tampa, FL 33602
Attorney for Plaintiffs
Phone:  (813) 223-7333
Fax:  (813) 223-2873
Email: richard.martin@akerman.com
Served via electronic filing

Daniel B. Rosenthal, Esq
daniel.rosenthal@akerman.com
Akerman LLP
2424 North Federal Highway
Suite 410
Boca Raton, FL 33431
Attorney for Plaintiffs
Phone:  (561) 862-4000
Fax:  (561) 368-4668
Email:  daniel.rosenthal@akerman.com
Served via electronic filing

Christopher G. Oprison, Esq.
christopher.oprison@akerman.com
Akerman LLP
750 Ninth Street NW
Suite 750
Washington, D.C. 20001
Attorney for Plaintiffs
Phone:  (202) 824-1703
Fax:  (202) 393-5959
Email:  christopher.oprison@akerman.com
Served via electronic filing